UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
WENDELL BROWN, :

Petitioner, : 10 Civ. 7728 (BSJ) (GWG)

-against- : REPORT AND RECOMMENDATION

THE STATE OF NEW YORK SUPREME COURT, :

:

Respondent.
---------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

Wendell Brown, proceeding pro se, brings this petition seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In 2007, Brown was convicted by a jury of Criminal Sale of a Controlled Substance in the Third Degree. See Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody, filed Oct. 8, 2010 (Docket # 1) ("Pet.") ¶ 5; S. Tr. 7.[1] Brown was sentenced as a predicate felon to a prison term of three and one-half years to be followed by three years of post-release supervision. See Pet. ¶ 4; S. Tr. 11. Brown argues that his petition should be granted on the grounds that: (1) there was insufficient evidence to support his conviction; (2) he received the ineffective assistance of trial counsel; and (3) he is entitled to have his conviction overturned based on Fourth Amendment violations. See Amended Complaint, filed Dec. 8, 2010 (Docket # 5) ("Am. Pet.") at 2-4. For the reasons stated below, the petition should be denied.

---

[1] "Tr." refers to volume 1 of the transcript of the trial (dated Feb. 15, 2007), "2Tr." refers to volume 2 of this transcript (dated Feb. 16, 2007), and "4Tr." refers to volume 4 of this transcript (dated Feb. 21, 2007). "H. Tr." refers to the transcript of the suppression hearing (dated Jan. 23, 2007) and "S. Tr." refers to the transcript of the sentencing (dated Mar. 13, 2007). All are contained in a single bound volume filed on April 15, 2011 (Docket # 13).

# I. BACKGROUND

## A. Facts

### 1. The Suppression Hearing

At the suppression hearing, Detective Richard Turk testified that on November 5, 2005, at approximately 5:30 p.m., he received a radio transmission that undercover Officer 5016 ("Officer 5016") had made a positive buy of crack cocaine from a black male wearing a white hat, gray sweatshirt, and blue jeans, who was standing in front of 302 West 22nd Street. See Turk: H. Tr. 2-5. Detective Turk was a couple of hundred feet from the location and arrived there five to ten seconds later. See Turk: H. Tr. 6. He saw Brown holding a clear plastic bag in his right hand and the undercover officer leaving the location. See Turk: H. Tr. 6-8, 14. Brown was the only person in the area who matched the description given by Officer 5016. See Turk: H. Tr. 6-7. As Detective Turk moved in to apprehend Brown, Brown threw the plastic bag to the ground. See Turk: H. Tr. 8. The bag was later discovered to contain "14 twists of crack/cocaine." See Turk: H. Tr. 8. Detective Turk searched Brown, recovered $150 in his possession, and placed him under arrest. See Turk: H. Tr. 6, 9.

Brown did not testify at the hearing or present witnesses on his behalf. See H. Tr. 15. After hearing the testimony, the court denied the motion to suppress. See H. Tr. 15. The court found Detective Turk had given credible testimony as he had been "very close by to West 22nd Street" and had "actually s[een] the undercover leaving the described person." See H. Tr. 16.

### 2. The Trial

The following evidence was presented at trial.

#### a. The Government's Case

On November 5, 2005, Officer 5016 and undercover Officer Andre Clarke were part of a

"buy and bust" police operation in the vicinity of Eighth Avenue and 22nd Street in Manhattan. See Officer 5016: Tr. 36-38; Clarke: Tr. 104, 106-07. The plan was to have the undercover officers purchase narcotics and to have the field team arrest the sellers. See Officer 5016: Tr. 37-38. Before the team commenced the operation, they had a "tactical plan meeting." See Officer 5016: Tr. 36; Turk: Tr. 142, 168. At the meeting one or more of the officers was given a "KEL" transmitter, a radio, a "ghost kit," and prerecorded buy money with which to make drug purchases. See Officer 5016: Tr. 39-40; Clarke: Tr. 122. The "ghost kit" is a concealed device which attaches to the radio worn by an undercover officer so that the officer may inconspicuously speak with the field team. See Officer 5016: Tr. 39-41, 99-100. The "prerecorded buy money" is photocopied before the team goes into the field so that each bill may be identified by its serial number. See Officer 5016: Tr. 40-41, 60-62; Clarke: Tr. 144-45; Turk: Tr. 171-72.

At approximately 5:30 p.m. that evening, Officer 5016 and Officer Clarke saw Brown "leaning up against a car on the southwest corner of 22nd and Eighth," in front of the Allerton Hotel. See Officer 5016: Tr. 42, 67-70; Clarke: Tr. 107-08, 127. Before they approached Brown, they radioed the field team that they "were about to approach a male black standing in front of the Allerton Hotel wearing a white hat, gray sweater and some blue jeans." See Clarke: Tr. 108-09. When they first approached Brown, Officer Clarke asked him if he had seen "Black," a nickname Clarke typically used to start conversations in the field. See Clarke: Tr. 109-10. Petitioner responded "'No. I ain't seen no Black out here.'" See Clarke: Tr. 110. Officer Clarke then stated "'Damn. I'm trying to get something,'" to which Brown replied, "'What you looking for?'" See Clarke: Tr. 110. Officer Clarke stated, "'I'm trying to get something for me and my girl.'" See Clarke: Tr. 110. When Brown asked, "'What do you

want?'" Officer Clarke said, "'Hold on,'" and called over Officer 5016. See Clarke: Tr. 110. Officer Clarke told Officer 5016 that Brown was going to "'hook [them] up.'" See Officer 5016: Tr. 42; Clarke: Tr. 110. Brown asked Officer 5016 what she wanted, and she replied that she wanted a "twenty," meaning a twenty-dollar bag of narcotics. See Officer 5016: Tr. 42-43; Clarke: Tr. 110. Brown told Officer Clarke to "watch his stuff" – referring to a bag on the ground that was later found to contain a CD player, headphones, CDs, batteries, a cell phone, and a cell phone case. See Officer 5016: Tr. 42-43; Clarke: Tr. 111, 116-18; Turk: Tr. 194-95. Brown and Officer 5016 then walked a short distance away on 22nd Street. See Officer 5016: Tr. 43. While Officer Clarke was waiting for the two to return, a black woman about five feet eight or nine inches tall, who was later identified as Cherise Edmonds, exited the Allerton Hotel and stood about five feet away from him. See Clarke: Tr. 112-13, 129-31; Turk: 150.

While Officer 5016 and Brown were separated from Officer Clarke, Brown took out a clear Ziploc bag, out of which he removed a "twist" containing crack cocaine. See Officer 5016: Tr. 43. Brown asked Officer 5016 "if it was a good size," to which she responded, "'Yeah.'" See Officer 5016: Tr. 43. Brown then handed her the bag and told her to put the money in his pocket. See Officer 5016: Tr. 43. Officer 5016 put two ten-dollar bills into his pocket and walked back toward Officer Clarke. See Officer 5016: Tr. 43. The area was well lit and Officer 5016 had an unobstructed view of Brown. See Officer 5016: Tr. 44-45. She observed that he had braids and was wearing a white hat. See Officer 5016: Tr. 45. As Officer 5016 walked back towards Officer Clarke, Edmonds – the woman who had been standing near Officer Clarke in front of the Allerton Hotel – walked toward Brown. See Officer 5016: Tr. 91-92; Clarke: Tr. 132-33. When Officer 5016 approached Officer Clarke she said, "'Come on, babe, we good. We good,'" which Officer Clarke understood to mean that she had purchased drugs from Brown.

See Clarke: Tr. 111, 125. Both officers walked away from Brown and Officer Clarke transmitted to the field team, "'Positive buy.'" See Clarke: Tr. 111, 125. One to two minutes after the purchase, Officer 5016 again transmitted a description of the seller to the field team – "male black, white hat, braids, wearing a gray zippered sweatshirt with the words 'New York' on the gray, blue jeans and white sneakers and goatee." See Officer 5016: Tr. 48. Both officers remained nearby so that they could observe the field team arrest Brown. See Officer 5016: Tr. 53, 90.

Detective Turk, who was parked nearby in an S.U.V. with his partner Sergeant Ponce, received Officer 5016's transmission that there had been a positive buy from a "male black in his twenties, five-eight, a hundred seventy pounds, white hat, gray sweater and blue jeans," who was now located "[i]n front of the Allerton Hotel, 302 West 22nd Street." See Turk: Tr. 146, 147-48, 154, 169, 190. Within five to ten seconds of receiving the transmission, Detective Turk drove to this location. See Turk: Tr. 148, 154-55, 183-84. When Detective Turk arrived at the area, which was "pretty well lit," the only person he saw who matched the description given by Officer 5016 was Brown. See Turk: Tr. 149, 181-82, 191-92. He was standing in close proximity to Edmonds, and Detective Turk saw them "touch[] hands." See Turk: Tr. 150-51, 163, 184. Detective Turk put his car into park and displayed his shield. See Turk: Tr. 150, 166. When Brown saw Detective Turk, he threw the plastic bag he was holding to the ground, at which point Detective Turk placed him under arrest. See Turk: Tr. 151, 155, 166-67, 193.

Officer 5016 and Officer Clarke, who were both standing nearby, saw the arrest. See Officer 5016: Tr. 52-54, 58, 92; Clarke: Tr. 126. As Detective Turk placed Brown under arrest, Officer 5016 radioed Detective Turk to confirm that the individual he was arresting was the person from whom she had purchased narcotics. She stated: "'Positive Buy. That's him.'" See

Officer 5016: Tr. 92; Turk: Tr. 151-52. Detective Turk recovered $150 in United States currency from Brown. See Turk: Tr. 159-60. As Detective Turk had seen Brown "touch[] hands" with Edmonds, he instructed Sergeant Ponce to "grab her, hang on to her," while Detective Turk handcuffed Brown. See Turk: Tr. 150-51, 196. Detective Turk then searched Edmonds and recovered a bag of marijuana and the two $10 bills of prerecorded buy money that Officer 5016 had placed in Brown's pocket. See Officer 5016: Tr. 57-58, 60-61; Turk: Tr. 163-64, 173-75, 196-97. Detective Turk also recovered the plastic bag that Brown had thrown onto the ground upon seeing him approach. The bag contained fourteen "twists" of crack cocaine. See Turk: Tr. 155, 157, 166-67. The packaging of this cocaine "was similar to the packaging" of the cocaine that Officer 5016 had purchased from Brown. See Turk: Tr. 158-59.

Donald Capitali, a criminalist with the New York City Police Department, examined the substance sold by Brown to Officer 5016, see Officer 5016: Tr. 42-44, 50-51; Capitali: Tr. 207, 209, and Siddiqa Baig, also a criminalist with the New York City Police Department, examined the substance within the fourteen "twists" dropped by Brown immediately before his arrest by Detective Turk, see Turk: Tr. 155-58; Baig: Tr. 219-220, 223. The examinations confirmed that these substances were cocaine. See Capitali: Tr. 213; Baig: Tr. 221-22. The "twist" sold to Officer 5016 weighed 2.1 grains. See Capitali: Tr. 216.

b. Brown's Case

Brown testified in his defense at trial. See Brown: 2Tr. 90. On November 5, 2005, he was standing outside of the Allerton Hotel, across from a Subway sandwich shop, drinking liquor and "chilling" with three friends. See Brown: 2Tr. 93-94, 97, 101, 126-27, 134. Brown was wearing a gray sweater with the words "'New York'" printed on the front, blue jeans, and red sneakers. See Brown: 2Tr. 103, 128, 133-34. When his friends went inside to use the

bathroom, a blonde woman and a dark-skinned man, who Brown later learned were undercover officers, approached him. See Brown: 2Tr. 98, 100, 128-29. The woman asked Brown if he knew "Black," and when Brown replied that he did not, the woman asked if he knew where she could "'get something.'" See Brown: 2Tr. 98, 112-13, 129. Brown responded that he did not "deal with that," and offered the two individuals a drink, but they walked away toward Ninth Avenue. See Brown: 2Tr. 98, 100-01.

Five minutes later, approximately seven police officers, including Detective Turk, "rushed" at Brown. See Brown: 2Tr. 99-100, 103-04, 115. As Brown thought he was going to be arrested for drinking in public, he dropped his cup of liquor on the ground. See Brown: 2Tr. 116, 139-40. Brown was then handcuffed and searched, and Detective Turk removed his wallet and other items, including a pack of cigarettes and a walkman, from his pocket. See Brown: 2Tr. 102-03. Brown had approximately $500 in his wallet as he had just been paid for plumbing work he had performed. See Brown: 2Tr. 95-97. He claimed that the police had lied about recovering only $150 from him during the search. See Brown: 2Tr. 97.

A thin woman whom Brown recognized from the building was standing approximately twenty feet away from him when he was arrested. See Brown: 2Tr. 105-06, 135-36. This woman was also arrested and the police recovered a large clear bag of "weed" from her jacket. See Brown: 2Tr. 107. Three other individuals were also searched. When nothing was found on them, these individuals left the area. See Brown: 2Tr. 107-08. In January 2005, ten months prior to Brown's arrest in this case, he pled guilty to third-degree robbery. See Brown: 2Tr. 110-11, 121-23, 145-53.

Isaac Palma and Theresa Lofton, friends of Brown who lived in the Allerton Hotel, also testified. See Palma: 2Tr. 3, 5, 41, 61; Lofton: 2Tr. 67-68. On the afternoon of November 5,

2005, Palma and Lofton passed Brown as they walked into the Hotel. See Palma: 2Tr. 7; Lofton: 2Tr. 69-70, 81-82. Brown was "sitting . . . with a couple of people outside, with a cup in his hand, drinking." See Palma: 2Tr. 7. Palma could not hear what Brown was talking about with his friends. See Palma: 2Tr. 56-58. When they got inside, Palma opened the window and looked outside. See Palma: 2Tr. 43-46. He saw two officers walk toward the Allerton Hotel from 22nd Street. One of them approached a woman standing further down the street from Brown. See Palma: 2Tr. 16-18, 44-45. Brown started to walk away from the area when one of the officers called out to him and said, "'Come here a minute.'" See Palma: 2Tr. 9. At this point, the other officer pulled a plastic bag out of the woman's jacket, showed it to the officer who had spoken to Brown, and said, "'Look. Look what we got.'" See Palma: 2Tr. 9, 19. Other than these statements, Palma could not hear what else was said by the individuals on the ground. See Palma: 2Tr. 58.

Additional officers then approached the scene, placed Brown up against a van, and searched him. See Palma: 2Tr. 17-20. After the search, the police handcuffed Brown and put him inside the van. See Palma: 2Tr. 9-10, 24-25, 27, 50, 56. Other than the plastic bag that was removed from the woman's jacket, Palma did not see any other plastic bags that night, and he did not see Brown drop a bag to the ground. See Palma: 2Tr. 24-25. The police also stopped a couple of other people on the street, but they were released without being searched. See Palma: 2Tr. 25-27. As Brown was being handcuffed, Palma called Lofton over to the window. See Palma: 2Tr. 50. When Lofton arrived, Brown and the woman were already in handcuffs. See Lofton: 2Tr. 70-71, 78.

c. The Verdict and Sentence

On February 21, 2007, the jury found Brown guilty of Criminal Sale of a Controlled

Substance in the Third Degree, and acquitted him of Criminal Possession of a Controlled Substance in the Third Degree. See 4Tr. 37, 43-46. On March 13, 2007, Brown was sentenced as a predicate felon to a prison term of three and one-half years, followed by three years of post-release supervision. See S. Tr. 6-7, 11.

B. Procedural History

1. Direct Appeal

Brown appealed his conviction to the Appellate Division, First Department, arguing that the prosecution had failed to prove his guilt beyond a reasonable doubt. See Brief for Defendant-Appellant, dated June 2009 (annexed as Ex. A to Declaration in Opposition to the Petition for a Writ of Habeas Corpus, filed Apr. 15, 2011 (Docket # 14) ("Decl. in Opp.")). The People filed a brief in opposition. See Brief for Respondent, dated Nov. 2009 (annexed as Ex. B to Decl. in Opp.). On December 22, 2009, the Appellate Division affirmed Brown's conviction. See People v. Brown, 68 A.D.3d 602, 602 (1st Dep't 2009). The court stated that "[t]here [wa]s no basis for disturbing the jury's determinations concerning credibility, including its evaluation of inconsistencies in testimony," and held that "[t]he verdict was based on legally sufficient evidence and was not against the weight of the evidence." Id. (citation omitted). The court also noted that "[t]he fact that the jury acquitted [Brown] of a possession count d[id] not warrant a different result, particularly since that count was based on the testimony of an officer who was not one of the undercover officers who testified about the sale." Id. at 602-03 (citation omitted).

Brown sought leave to appeal to the New York Court of Appeals, asking the court to review the same claim he had raised in the Appellate Division. See Letter from Hale to Hon. Lippman, dated Jan. 14, 2010 (annexed as Ex. D. to Decl. in Opp.). In March 2010, the Court of Appeals denied leave. See People v. Brown, 14 N.Y.3d 798 (2010); Certificate Denying Leave

(annexed as Ex. F to Decl. in Opp.).

2. The Instant Petition

In a petition dated August 30, 2010, and filed on October 8, 2010, Brown claimed that: (1) he was not afforded "total protection" under the Fourteenth Amendment because "the law was not administered fairly"; (2) his Sixth Amendment rights were violated by his attorney and the court; and (3) his Eighth and Fourth Amendment rights were violated because the "trial court did not administer fair and equal protection of the law." Pet. ¶ 13. Pursuant to court order, see Order, filed Oct. 8, 2010 (Docket # 2), Brown filed an amended petition on December 8, 2010, see Am. Pet. In this petition, Brown seeks relief on the grounds that: (1) there was insufficient evidence to support his conviction; (2) he received ineffective assistance of trial counsel; and (3) his conviction should be overturned based on Fourth Amendment violations. See id. at 2-4.

Respondent filed papers in opposition to the petition. See Memorandum of Law in Opposition to the Amended Petition for a Writ of Habeas Corpus, filed Apr. 15, 2011 (Docket # 15) ("Resp. Mem."); Decl. in Opp. Brown did not submit a reply brief.

## II. APPLICABLE LAW

### A. The Legal Standard for Petitions Brought Pursuant to 28 U.S.C. § 2254

A petition for a writ of habeas corpus may not be granted with respect to any claim that has been "adjudicated on the merits" in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

For a claim to be "adjudicated on the merits" within the meaning of section 2254(d), it

must "finally resolv[e] the parties' claims, with res judicata effect," and it must be "based on the substance of the claim advanced, rather than on a procedural, or other, ground." Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001) (citations omitted). As long as "there is nothing in its decision to indicate that the claims were decided on anything but substantive grounds," a state court decision will be considered to be "adjudicated on the merits" even if it fails to mention the federal claim and cites no relevant federal case law. Aparicio v. Artuz, 269 F.3d 78, 94 (2d Cir. 2001); accord Harrington v. Richter, 131 S. Ct. 770, 784-85 (2011) ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.") (citation omitted); see also id. at 784 (section 2254(d) deference applies even "[w]here a state court's decision is unaccompanied by an explanation"). Moreover, a state court's "determination of a factual issue" is "presumed to be correct," and that presumption may be rebutted only "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

A state court decision is "contrary to" clearly established federal law only "if the state court applies a rule that contradicts the governing law set forth" in Supreme Court precedent or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives" at a different result. Williams v. Taylor, 529 U.S. 362, 405-06 (2000). Habeas relief is available under the "unreasonable application" clause only "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. A federal court may not grant relief "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411. Rather, the state court's application must have been

"objectively unreasonable" – a standard that is met only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" Supreme Court precedent. Harrington, 131 S. Ct. at 786; accord id. ("even a strong case for relief does not mean the state court's contrary conclusion was unreasonable"). In other words, to demonstrate an "unreasonable" application of Supreme Court law, the habeas petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 786-87.

The "determination of whether a court has unreasonably applied a legal standard depends in large measure on the specificity of the standard in question." Brisco v. Ercole, 565 F.3d 80, 89 (2d Cir.), cert. denied, 130 S. Ct. 739 (2009). "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations" inasmuch as the application of a general standard to a specific case "can demand a substantial element of judgment." Yarborough v. Alvarado, 541 U.S. 652, 664 (2004); accord Brisco, 565 F.3d at 90 (court applying a "fact-dependent standard . . . to the facts of a specific case is . . . entitled to significant 'leeway' when [a habeas court] review[s] its decision for reasonableness") (quoting Yarborough, 541 U.S. at 664).

Only holdings of the Supreme Court are considered for purposes of determining "[c]learly established federal law." Rodriguez v. Miller, 537 F.3d 102, 106 (2d Cir. 2008) (internal quotation marks and citation omitted). Thus, "[n]o principle of constitutional law grounded solely in the holdings of the various courts of appeals or even in the dicta of the Supreme Court can provide the basis for habeas relief." Id. at 106-07 (citation omitted). Where there is "[n]o holding" from the Supreme Court on the question presented, Carey v. Musladin,

549 U.S. 70, 77 (2006), or where Supreme Court cases "give no clear answer" to the question presented in the petition, Wright v. Van Patten, 552 U.S. 120, 126 (2008) (per curiam), a state court's decision cannot be contrary to or an unreasonable application of clearly established federal law. See Knowles v. Mirzayance, 129 S. Ct. 1411, 1419 (2009) ("[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court.") (internal quotation marks and citations omitted).

B. Exhaustion

"Before a federal court may grant habeas relief to a state prisoner," however, " the prisoner must exhaust his remedies in state court." O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999); see 28 U.S.C. § 2254(b)(1)(A). The Supreme Court has held:

> Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts, . . . state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.

O'Sullivan, 526 U.S. at 845; accord Smith v. Duncan, 411 F.3d 340, 347 (2d Cir. 2005). Thus, a petitioner is required to have presented each claim to all available levels of the state courts. See, e.g., Baldwin v. Reese, 541 U.S. 27, 29 (2004) ("the prisoner must fairly present his claim in each appropriate state court (including a state supreme court with powers of discretionary review)") (internal quotation marks and citations omitted).

III. DISCUSSION

We now discuss each of the claims in Brown's amended petition.

A. Ineffective Assistance of Counsel

Brown argues that he did not "receive[] adequate legal representation . . . during the initial arrest process and during the trial." See Am. Pet. at 3. As respondent notes, this claim was raised for the first time in Brown's federal habeas petition and is thus unexhausted. See Resp. Mem. at 13-16. This lack of exhaustion means that Brown's habeas petition is a "mixed" petition – that is, one containing both exhausted and unexhausted claims. The Supreme Court has squarely held that "federal district courts must dismiss mixed habeas petitions." Pliler v. Ford, 542 U.S. 225, 230 (2004).

Even after a direct appeal has been exhausted, a criminal defendant in New York may in some circumstances raise an ineffective assistance of counsel claim through a motion to vacate the judgment of conviction under New York Criminal Procedure Law § 440.10. Respondent argues that Brown cannot do so here, however, because his claim of ineffective assistance of counsel is based on the trial record and would therefore be procedurally barred pursuant to N.Y. Crim. Proc. Law § 440.10(2)(c). See Resp. Mem. at 15. It is not necessary to reach this question, however, because Brown has not made a timely and meritorious application to stay the instant petition to allow him to exhaust his ineffective assistance claim. Nor does anything in the record suggest that, were he to make such an application, he could meet the "good cause" requirement for such a stay. See, e.g., Rhines v. Weber, 544 U.S. 269, 277 (2005) (stay to allow exhaustion permissible only where there is "good cause for the petitioner's failure to exhaust his claims first in state court"). Also, he has made no showing that his ineffective claim is not "plainly meritless" – another prerequisite for the granting of a stay. See id. Indeed, the description of his ineffective assistance claim, see Am. Pet. at 3, is devoid of any reasoned explanation of its basis. Thus, Brown has made no showing that he would be entitled to stay this petition.

Rather than dismissing the petition in its entirety because it is a mixed petition, as required by Pliler, the Court assumes that Brown would prefer that the ineffective assistance claim be deemed withdrawn from the petition so that the Court can consider any exhausted claims. Accordingly, we deem this claim to be withdrawn.[2]

B. Fourth Amendment Claim

Brown argues that his conviction was obtained based on an illegal search in violation of the Fourth Amendment. See Am. Pet. at 3. This claim too was never exhausted and no explanation has been given for the failure to do so. Therefore, we deem it to be withdrawn for the same reasons just stated.

In any event, 28 U.S.C. § 2254(a)(2) permits a court to deny an unexhausted claim on the merits. Here the Fourth Amendment claim must be denied under the doctrine articulated in Stone v. Powell, 428 U.S. 465 (1976). In Stone, the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." Id. at 481-82 (footnote omitted); accord Capellan v. Riley, 975 F.2d 67, 69-70 (2d Cir. 1992). The Second Circuit has explained that habeas review of Fourth Amendment claims will be "undertaken in only one of two instances: (a) if the state has provided no corrective procedures at all to redress the alleged fourth amendment violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process." Capellan, 975 F.2d at 70

[2] If Brown prefers to have the entire petition dismissed, the Court would do so upon his request.

(citations omitted).

Neither prong of this test is met here. First, New York provides a corrective procedure in the form of a suppression hearing. See N.Y. Crim. Proc. Law § 710.10 et seq.; Capellan, 975 F.2d at 70 n.1 ("the 'federal courts have approved New York's procedure for litigating Fourth Amendment claims, embodied in N.Y. Crim. Proc. Law § 710.10 et seq., as being facially adequate'") (quoting Holmes v. Scully, 706 F. Supp. 195, 201 (E.D.N.Y. 1989) (additional citations omitted). Second, Brown was never precluded from using this mechanism. Indeed, the court held a suppression hearing. While Brown ultimately lost on the merits, he had every opportunity to litigate his Fourth Amendment claims and thus he is now barred from habeas review of these claims. See, e.g., Plunkett v. Johnson, 828 F.2d 954, 956 (2d Cir. 1987) (finding petitioner's Fourth Amendment claim lacked merit where the issue was fully litigated in a suppression hearing subject to state appellate review).[3]

C. Sufficiency of the Evidence Supporting the Conviction

Brown argues that his conviction was not supported by legally sufficient evidence. See Am. Pet. at 2-3. He states that "upon the initial arrest [he] was not in possession of any drugs nor was [he] in any close proximity to the drugs that were alledgely [sic] found by the arresting officer's [sic]." Id. The claim of legally insufficient evidence was presented to all levels of the state courts and thus is exhausted.

The Due Process Clause of the Fourteenth Amendment prohibits a criminal conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime

---

[3] McBean v. City of New York, 260 F.R.D. 120 (S.D.N.Y. 2009), cited by petitioner in support of his Fourth Amendment claim, see Am. Pet. at 4, is of no relevance here. McBean was a civil case seeking money damages for an allegedly unconstitutional strip search policy, and thus was not governed by the Stone doctrine.

. . . ." In re Winship, 397 U.S. 358, 364 (1970). A court reviewing a sufficiency of the evidence claim must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original) (citation omitted). To prevail, the petitioner must show that "upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Id. at 324; accord Ponnapula v. Spitzer, 297 F.3d 172, 179 (2d Cir. 2002).

In conducting this review, "assessments of the weight of the evidence or the credibility of witnesses are for the jury," and thus a habeas court will "defer to the jury's assessments of both of these issues." Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996) (citing cases); accord Fagon v. Bara, 717 F. Supp. 976, 979-80 (E.D.N.Y. 1989) ("[T]his court is not free to make credibility judgments about the testimony . . . or to weigh conflicting testimony.") (citing cases). "[A]ll possible inferences that may be drawn from the evidence must be construed in the prosecution's favor." Maldonado, 86 F.3d at 35 (citing cases). Where the record supports competing inferences, the habeas court must "'presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" Wright v. West, 505 U.S. 277, 296-97 (1992) (quoting Jackson, 443 U.S. at 326). A habeas petitioner challenging the sufficiency of the evidence underlying his conviction, therefore, bears a "very heavy burden." Knapp v. Leonardo, 46 F.3d 170, 178 (2d Cir.) (internal quotation marks and citations omitted), cert. denied, 515 U.S. 1136 (1995). Moreover,

> in order to grant the writ it is not enough for [a habeas court] merely to disagree with the state appellate court's conclusion about the sufficiency of the evidence; rather, habeas corpus will be granted only if the state court applied Jackson v.

> Virginia in an unreasonable manner. Furthermore, since Jackson calls for the application of a "general" standard, the state court is entitled to additional "leeway." Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).

Langston v. Smith 630 F.3d 310, 320 (2d Cir.) (additional citations omitted), petition for cert. filed, 79 USLW 3609 (April 7, 2011).

In considering the sufficiency of the evidence in support of a state conviction, a federal habeas court "'must look to state law to determine the elements of the crime.'" Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 811 (2d Cir. 2000) (quoting Quartararo v. Hanslmaier, 186 F.3d 91, 97 (2d Cir. 1999), cert. denied, 528 U.S. 1170 (2000)). Under New York law, "[a] person is guilty of criminal sale of a controlled substance in the third degree when he knowingly and unlawfully sells . . . a narcotic drug." N.Y. Penal Law § 220.39.

Here, a rational jury could have credited the police officers' testimony and found that Brown knowingly and unlawfully sold a narcotic drug in violation of New York Penal Law § 220.39. At trial, there was ample testimony to show that Brown gave Officer 5016 a "twist" of crack cocaine in exchange for twenty dollars. See Officer 5016: Tr. 42-45; Turk: Tr. 163-64, 173-75, 196-97; Capitali: Tr. 213. The jury was not required to accept Brown's testimony to the contrary.

## IV. CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus should be denied.

## PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections. See also Fed. R. Civ. P. 6(a),

(b), (d). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Barbara S. Jones, and to the undersigned, at 500 Pearl Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Jones. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).

Dated: July 7, 2011
New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copies to:

Wendell Brown
55 West 110th St., Apt. 638
New York, NY 10026

Leilani Rodriguez
Assistant Attorney General
120 Broadway
New York, NY 10271

**PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections. See also Fed. R. Civ. P. 6(a), (b), (d). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Barbara S. Jones, and to the undersigned, at 500 Pearl Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Jones. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).

Dated: July 6, 2011
New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copies to:

Wendell Brown
55 West 110th St., Apt. 638
New York, NY 10026

Leilani Rodriguez
Assistant Attorney General
120 Broadway
New York, NY 10271